One case submitted on the briefs and it's submitted as noted on the calendar. First case to be argued is Suddeth. Suddeth? Suddeth. That's the State of California. And you are? Melissa Fair from the Federal Defender on behalf of Timothy Suddeth. You may proceed. You're going to have to keep your voice up, though. It's a bad room for acoustics. I'm sorry. I'll work on that. I'd like to reserve five minutes for rebuttal, if that's okay. You just lost the clock. And when you get down to five minutes, you stop talking. Okay. Otherwise, it'll keep going and you'll lose out your rebuttal. Go ahead. Mr. Suddeth's Fifth and Fourteenth Amendment rights were violated by... I think you really better talk up. Try to pull that mic closer to your mouth, if possible, and just project. Okay. Mr. Suddeth's Fifth and Fourteenth Amendment rights were violated by the admission of his illegally obtained statements into evidence. The district court correctly held that the State's denial of this claim constituted an unreasonable application of clearly established Supreme Court precedent. But the district court erred in concluding that the admission of these statements did not have a substantial and injurious effect on the verdict. The district court applied the wrong standard in making this determination. On the question of whether he invoked the right to counsel, what law do we apply? Miranda and its progeny. And what we have to hold is that the state court's conclusion that he didn't is clearly unreasonable? An unreasonable application of Miranda. Correct. That's a tough hurdle for you to jump over. He says, he gets asked, do you want a lawyer? He says, I want a lawyer, not a public defender. More or less that's what he says, right? And then he says, I can't afford a lawyer. It's almost like the classic syllogism. He says, you know, I want a lawyer, not a public defender, but I can't afford a lawyer. Doesn't that leave you with, I don't want a public defender? Is it really unreasonable of the state courts to say that this was not a clear application of right to counsel? I think it was unreasonable because when Mr. Sudeth said, I want a lawyer, he was unequivocally invoking his right to counsel. I think when he said. If he'd said, period, I want a lawyer, period. But don't we have to take it in context of the complete sentence? I want a lawyer, but not a public defender. I think. Suppose he said, I want a lawyer, but I don't think I'll have one this time because I found out if you try cases on your own, the Court of Appeals always finds a way of reversing the conviction. Clearly, something like that, we would just say there was not a demand. Except that's not what he said in this case. He said, I want a lawyer, not a public defender, meaning I want a panel attorney or private counsel. Wait a minute now. You didn't say that. He said, I want a lawyer, not a public defender. Now, what is at that particular time, what did the State of California provide? It would provide a public defender. Would it provide anything else? He actually ended up having a panel attorney appointed to his case. So he did get his request fulfilled. So someone could be appointed at that time. Is that correct? Who is from the private bar? Yes, Your Honor. Okay. So he says, I don't want a lawyer. I want a lawyer, but not a public defender. Uh-huh. So you want to attribute that, I want a panel lawyer appointed by the court who is from the private bar. Or private counsel. But honestly, I think it's irrelevant to this inquiry. The question is whether or not he wanted an attorney appointed to his case. And he says, I want a lawyer, not a public defender. So whether he. Whether it's equivocal or not. Is it ambiguous? Right. I think it's an unequivocal request for counsel. I think the type of counsel that he wanted was ambiguous. But I think that's irrelevant to whether or not the officer should have ceased questioning. The question is whether. You want to put a period in after, I want a lawyer. And then a discussion as to whether the second part is second level. Well, I actually think that even if you put a period after the second part, it's still an unequivocal request for counsel. He's still saying, I want a lawyer, not a public defender. Whether he wanted a panel attorney or a private attorney appointed is irrelevant to whether or not the officer should cease questioning after he made that indication. Yeah. Well, we don't know what's in his mind. I mean, is there anything in the record that indicates he knows the difference between a public defender and a panel appointee? Well, I think that he's seeking clarification about what the difference is between a lawyer and a public defender. But I still don't think that's relevant to whether or not he's invoking his right to counsel. Whether he wanted, he says, I want a lawyer in response to the question, in response to the second portion of his Miranda rights, which had just been read to him four lines earlier. The officer said to him, you have the right to a lawyer and to have him present with you while you're being questioned. Four lines later, he says, I want a lawyer, not a public defender. So he's clearly invoking his right to counsel. I think he's confused about exactly what the difference is between a public defender, a private attorney, and a panel attorney. I have a question about this panel business. This was state court, of course. Uh-huh. And when you were answering Judge Wallace's questions, you were telling us what the practice was in state court in the judicial district? Uh-huh. I think it was El Dorado County. The police department was south of Tahoe. Can you explain it to me? I know what the federal system is. We have a public defender and we also have CJA panel attorneys, and we call them panel attorneys. Uh-huh. Tell me a little bit more about the state system. What exactly did El Dorado County provide? You know, practicing in federal court, I'm so unfamiliar with that. I know Tim Sudeth ended up with a panel attorney who was a private attorney who accepted panel cases. I know he did not end up being represented by a public defender, although initially I believe a public defender was appointed to represent him. The reason I'm wondering is I know that, I know, I don't know, based on what I understand from some districts and some state courts, I don't know if it's applicable here, a lot of places will appoint a public defender, a lot of courts will appoint a public defender, and if a public defender has a problem or an overflow or a conflict of interest, and sometimes you have conflicts of interest because you're representing multiple defendants, then they will go outside. But the usual, the default mode, if you're appointing a lawyer at the point that Mr. Sudeth was being interviewed, at that point in the process, there really is no choice. You always get a public defender. You don't know the answer to that question. I'm not trying to put words in your mouth. I'm not, but if you do know, tell us. I don't, but, again, I think it's irrelevant to whether or not he was invoking his right to counsel. Well, but it's not really irrelevant. It's at least of some relevance or some significance because your theory is he was saying, look, I don't want this kind of lawyer. You know, he has an opportunity to do this. That he was really saying, I want this other kind of lawyer appointed, and if that kind of thing is an option and he was a repeat offender in that jurisdiction, he might know, you know, if I hold out, I won't get the public defender. I can negotiate to have a final attorney. But that's not possible if it's a kind of system that I'm aware of, which is that at that point you get a public defender. Later on, if there are conflicts or something, then you might go outside. But I'm sorry. Up to that point, he hasn't voiced any problems with hiring a private attorney. He hasn't said, I don't have enough money to hire private counsel. But he does about two lines later. Right, but you can't, according to Smith, subsequent statements can't be considered in determining whether or not an individual has invoked their right to counsel. So anything beyond his invocation, assuming it's unequivocal, and I think it is, cannot be considered in determining whether that invocation is ambiguous. So all that officer knew at that point is what Mr. Sudett said. And your position is that for the state courts to say that that's ambiguous is not just wrong, it's unreasonable. I think it is absolutely unreasonable. I think the statement, I want a lawyer, actually the government conceded that his statement, I want a lawyer, comma, not a public defender, considered in isolation is an unequivocal invocation of his right to counsel. They conceded that in their brief. The government's argument is that the totality of the Miranda inquiry should be considered in determining whether the statement is ambiguous. If we get past that point, I'm going to switch. Go ahead. I had one other question. You can quickly tell me. I'm having trouble deciding what is the second layer, if there's a sentence or a pause. I mean, I don't know if it means later on when they come back. That's the usual case. You get the cop comes back and here we have the same conversation, but there's one or two sentences in between. Have we do we have a case on what that cutoff period is? That is, if there's a sentence intervening or three sentences intervening or later on, do we have a case on what is the context of the statement? There are some cases on that. I recall reading a Ninth Circuit case on that. I'm not sure specifically what the time period is. That's what I was wondering about. I didn't read one. I wondered if you had one that can give me that definition. No. I remember reading cases where there's a pause between an invocation, like someone makes a statement, I want a lawyer, and then immediately interjects, but I'll answer your questions right now. Right. And in a circumstance like that, their invocation wouldn't be considered a present invocation of a right to counsel. I think this case can be differentiated from that because Mr. Sudat says, I want a lawyer, not a public defender. The officer follows that statement by saying, okay, okay, well, this is up to you. That's fine. If you want a private lawyer, there's no problem there. I mean, and Sudat says, I can't afford it, but I want a legal aid. I don't want a public defender. He works for you. Now, the off ---- Is that the context of what we're looking at, or is that second part second tier? I think it's second tier because he's already clearly invoked ---- And what's the best case to make it second tier as distinguished from one conversation? I'm sorry? What's the best case you rely on that that is all ---- that's second tier rather than part of one conversation? I think it follows from Miranda, but I think the case that's most on point is Smith v. Illinois. Okay. I just wanted your best case. Thank you. I can read it. Excuse me, Judge. Why don't we go ahead and move on to some of the statements? The one statement, of course, is threatening of the witnesses, right? Mm-hmm. That's a crime in itself. That's not suppressible, right? I think it is, pursuant to Miranda. Miranda says that all statements as a result of an illegal interrogation should be excluded at trial, and the threats were a result of the illegal interrogation. I think the reason that the court in Miranda made that finding is because any statement after an invocation is considered involuntary. So let's say that he's properly Mirandized. He invokes his right to counsel. We go ahead with the interrogation. All of a sudden he lunges over and says, I'm going to kill you, takes out a knife and assaults the officer. You think you can't? You could admit the evidence of the assault, but not the exclamation, I'm going to kill you? Absolutely. Is that your position? Absolutely. I think the act itself. I don't see any case that really supports that. Miranda supports it. No, I understand the general theory that statements produced as a result of interrogation ought to be suppressed. But threats uttered, that seems to me an entirely different matter. Tell me why analytically you think it's the same. Because the threats are a product of compulsion, subtle or otherwise. In Miranda, the court states any statement taken after invocation is a product of compulsion. And the whole reason that people need to be protected during interrogation is because of the pressures that they're under during that interrogation. But the whole theory of Miranda, and before that I think in the common law, was you don't want people to confess to past crimes that they did not commit. What about crimes they're committing right in the interrogation room? Why under the theory of Miranda would that immunize them? The fact that they're under compulsion doesn't allow them to kill anybody in the interrogation room, does it? The Miranda court ruled that all statements made during an illegal interrogation are involuntary. And I think what that suggests is that threats made as a result of an illegal interrogation are also involuntary. The Miranda court said compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations. I think that Mr. Sudeth was under a tremendous amount of pressure in that interrogation room for a variety of reasons. I think when the officer refused to cease questioning after Mr. Sudeth clearly invoked, that there was subtle compulsion going on there, and I think that all statements that followed that invocation were involuntary. What do you do about cases like United States v. Mitchell? I'm sorry? United States v. Mitchell, 8-12, 3rd, 2nd, 1250? The guy who made threats against the president after he was taken to custody? I think Mitchell is distinguishable for a number of reasons. First of all, Mitchell was a Fourth Amendment case, not a Fifth Amendment case. The biggest distinction, though, between Mitchell, Gordon, and Mr. Sudeth's case is that the evidence that was admitted in Mitchell and Gordon was only admitted for, in regard to their prosecution for the threats that were made. How does that differ here? In Mr. Sudeth's case, he was prejudiced not only because the threats were admitted against him in regard to the charge for dissuading a witness, but also because the threats were used against him in regard to the rape charges and the lewd and lascivious conduct charge. And that's where it became really prejudicial. Wasn't it the remedy for that severance rather than suppression? Absolutely, which was denied. So I think at the very least what this Court should do is remand this case for a new trial on the dissuading a witness count and have the trial be severed and have a separate trial for the rape counts and the lewd and lascivious conduct count. The threats were really prejudicial in regard to the ---- Four minutes. I should probably stop for a moment. Thank you. We'll next hear from the State of California. Good morning, Your Honors. Paul Bernardino on behalf of the State Attorney General's Office, and may it please the Court. It is the State's position that the conviction for two counts of forcible rapes, one count of child molestation, and one count of threatening the detective be affirmed as they have been affirmed by the State courts and the Federal District Court. We suggest, Your Honor, that the State court's decision was not unreasonable when it found that Mr. Sudeth did not clearly and unambiguously invoke this right to counsel. Will we look at that de novo? Is that our standard of review? Not at all, Your Honor. As Delgado presents to us, the Court needs to look and assume the facts as found by the State court. And in this particular case ---- The question is whether this is a factual finding, then, isn't it? Yes. The standard under AEDPA, Your Honor, is that, one, the Federal courts should protect the State court's determination and that a conviction should not be reversed unless it finds that the State court has either applied the Supreme Court precedent contrary to its precedent or that there was an unreasonable application of Supreme Court precedent. If this came up from a conviction on the Federal side, we would look at whether or not the person's right to counsel was violated de novo, correct? That's correct. And that's, I think, what happened on ---- And, agreement, that's the answer to the question. And then what you're saying is that even though on the Federal side we look at it de novo, that because this is a habeas conviction, we have a different standard of review that we apply to whether or not the violation of counsel took place, right to counsel took place. And that's correct. And that standard you wish to have us apply is? The unreasonable application standard, Your Honor, under AEDPA. And that, your case that says that that is the standard we apply is what? Well, one is the face of 2245, which is the AEDPA statute. Right. And secondly, there is a last reasoned opinion in this case. And I think the law is clear on that. The only case that I can think of right now is a case that's called Delgado. However, in that case, there was not even a last reasoned opinion. And even on that case, the Court applied a deferential standard. Have we ruled on that in the Ninth Circuit? You know, I'm not certain. To the extent that we're applying 2245, which requires, the language of 2245 requires that the State conviction should not be reversed unless there's an unreasonable application. The issue is one that's very important as far as one-third of the bench is concerned. This is not a clear case. It's not a cut-and-dry case. Standard review very often determines how we vote based upon how we are going to look at the factual situation. If it's de novo, we may well find the right to counsel has been violated. But if we have a lesser standard review, we might not. And your position is, as I understand it, that there has not been a Ninth Circuit case actually holding what that standard review is in this circumstance? No, Your Honor. Our position is that the Ninth Circuit has spoken on it, and Delgado has not. In Delgado. Okay. So that's the case we need to look at. Yes. All right. Thank you. Review the district court's decision de novo, though. Correct. As a matter of law, that's correct, Your Honor. Now, the factual findings made by the district court should be unclearly erroneous. Here, it was – I think it's undisputed that the trial court found that the invocation was ambiguous. The detectives questioning here were very narrow, trying to find out whether or not he wanted an attorney. The first sentence doesn't seem to be terribly ambiguous. He wants an attorney. He doesn't want a public defender. Right? That's easily understood. We would – I think it could be – that's a more difficult question, Judge Thomas. It's the context of it that creates the ambiguity. Right. The second or third line then casts doubt upon it. But if we're only faced with the first assertion and nothing else, you'd have to agree that that was an unequivocal request for counsel. We conceded on the brief, just to correct the record, under Respondent's Brief, page 30, that if it was just, I want a lawyer, period, that is clear. Sure. Invocation. But on the face of it, it would seem that he's asking for counsel. He doesn't want a public defender. That's a period. He's not saying, I don't want counsel, right? Yes. It's a harder question. The case here, though, presents a more difficult question. Right. I'm just taking it one step at a time. And I gather you're about 90 percent on board on the initial assertion. Maybe not. But it seems to me that there's no doubt there's a request for counsel. Then the question is, does it become ambiguous later when he says, well, I can't afford a lawyer, but I don't want a public defender? Now, tell me why you think that that, why we need to apply the context there, rather than take them all together as one statement, as opposed to something that happened later in the interrogation. We believe that the standard is Davis, which the Supreme Court has permitted questioning to clarify whether or not there was an invocation of an attorney. And in this particular case, when he says, but I can't afford one, I don't want a public defender, I don't want legal aid, that presented, as Judge Kaczynski has pointed out, the classic syllogism. He has already been informed of his rights earlier. He already acknowledged that an attorney will be provided for him if he couldn't afford one. If there was any other question to be asked, the proper question was what the detective asked, which is, okay, knowing your rights, what do you want to do? Because any other questioning would just get them into a circular back and forth. And we believe that under Davis it permits the officer to reasonably ascertain the willingness and the willfulness of the suspect to proceed without an attorney. Now, I gather that if, and it's not this case, but let's assume for the sake of argument that you had a sophisticated criminal defendant who said, yes, I would like to invoke my right to counsel. I don't want a public defender. I would like a panel attorney. That would be fairly unequivocal, right? Yes. Or I want a private attorney, right, if he could afford one. Right. Yes. And that would be a harder question, but that's not this case, Your Honor. And I might add. I don't think the officer is under any obligation then to explain after he said, well, I can't afford a private attorney, to say, well, you have, that's all you have. You have to have a public defender or a panel attorney. You don't think there was any obligation to further explain his rights at that point because it would seem to me he was confused about them. Yes. Because I would submit that he was confused and therefore the seizing of questioning should not have been mandated at that point. And that's, in fact, the concerns that the Supreme Court had in United States v. Davis on what script should be asked, if any. And we believe that the Supreme Court at that point went against adding a second level or a third level Miranda, just saying, okay, if there is an ambiguity, then this is all the question you should ask. Well, let's say that the questioning had been something like this, or the answer. I would like an attorney. I don't want anybody from the prosecutor's office. And he said, well, you know, you're not entitled to an attorney of your choice unless you can afford one. And then he continued. It would seem to me that probably there would be sufficient indication that the suspect did not understand the Miranda warning that clarifications call for, wouldn't you agree, under that hypothetical? Well, we believe that the explanation, the requirement under Miranda, that once the warning has been given, then that presumes that it has dispelled any sort of coercive nature that the custodial setting has been made, and also that he had been knowingly advised of his rights. All right. So let me summarize where I think your position is, and you can correct me. Your position is that after a Miranda warning is given, no further explanation need be given, even if the suspect exhibits some confusion about the meaning of the Miranda warning. Is that your position? Our position, Your Honor, is that the Supreme Court has not mandated an explicit language it needs to follow. There needs to be some clarification that needs to be made by the detective and a standard is whether or not a reasonable detective would find that the invocation was ambiguous and there is no set formula, for lack of a better word, on what follows. And we submit that the detectives here, when they ask, well, what do you want to do, was reasonable. Yes, Your Honor. I understand your argument on this case. Thank you. Thank you. Let me pursue Davis. In Davis, the officer was somewhat concerned and said, we're going to stop right here and go no further until we settle this thing. Do you want a lawyer? That's correct. That didn't happen here. That's true, Your Honor. And then they took a break and then he came back and says, I think I want a lawyer. I'm not going to say anything further. How does Davis help you? Davis helps by clarifying that there are times when references to an attorney are ambiguous and that when that's the case, Davis says that the detective need not stop questioning as people, as Edwards may perhaps have dictated. And here, the court has left it up to the reasonable detective to make that determination. So what you're saying is you're using Davis for the position that when he says, I want a lawyer, not a public defender, okay, okay, well, this is, that's up to you, that's fine. If you want a private lawyer, there's no problem, I mean. Answer, I can't afford it, but I want a lawyer. I don't want legal aid. I don't want a public defender. He works for you. What you're saying is that intervening question under Davis doesn't keep us from looking at the context of both of those answers, which was interrupted by a partial, partial statement. That's correct. That's why you're citing Davis. Yes, Your Honor. Okay. Now, let's get to whether or not, how much ambiguity you need. If you take both of these together, what he's saying is, I assume, is I want a lawyer, but I don't want a public defender. Are you assuming he's saying I don't want anyone paid for by the state? Or are you assuming he says I don't want a public defender? Our position, Your Honor, is that he wanted a private lawyer, but he can't afford one. It would seem like what he was asking for is I want a lawyer, I don't want a public defender. What I really want is Johnny Cochran, but I can't afford him. Well, maybe, but he didn't say that. He said private lawyer. The record doesn't tell us, although counsel was helpful, the record doesn't tell us what the State of California did at that time as far as appointment of counsel is concerned, whether they went to the public defender, whether they went to panel attorney, or whether a defendant has a right to choose between the two. Is there anything in the record itself to tell us that? Not that I know of, but I can share with the Court, having been a state prosecutor for six and a half years, that they are given the scenario provided by Judge Kaczynski, where at arraignment they are offered the public defender's office, and they don't have an option to get the panel attorney, nor would they have an option to get Johnny Cochran. That's not in the record, so that doesn't help us. So we're sort of left adrift as to whether or not this is ambiguous in what it means. There's no showing what the State of California did or what was in his mind. So I take it your view is that there's sufficient ambiguity there that the right was not demanded. That's your position. Under Davis, and also under the standard review in this case, that the state conviction should be protected unless the court's determination was an unreasonable application. And presumably the state court judges would know a good deal more about the state practice than we do. That's correct, Your Honor. So maybe insofar as there's an ambiguity as to what the practice was, maybe we ought to defer to the state court on that point. And that the federal courts should defer to the state court's determination under the spirit and the expressed language of AEDPA. Even assuming, Your Honors, that there was a Miranda error, the error is harmless in this case. We suggest to this court that even after a seven-day jury trial where evidence was presented, this is not from the start of trial until the end, it spanned more than seven days, but seven days of trial testimony, the jury here only deliberated for three hours and 21 minutes. They started deliberation at 9.15 a.m. and ended deliberation at 12.36 p.m. And were to assume something from that? I would suggest, Your Honor, that... I don't know where your argument is going, but do you have a case that we're going to put a time clock on the jury and decide whether or not there's overwhelming evidence? Is that your position? To the extent that it didn't take them that long to reach a verdict, I would just submit that there was sufficient evidence, or at least... I guess if I were to go down to the standard... We certainly look at how long the jury deliberated in harmless error cases. Correct. And I would submit that here, under the standard of Breck, that whether or not even assuming error, the statements that were admitted unreasonably or substantially influenced the verdict, we submit that it could not, primarily for one reason. Out of all of the statements that appellant has challenged, really only two of those statements were effectively testimonial. The first one, the reason why it's not testimonial, is because it falls under the exception of Miranda under this Court's own ruling in Mitchell and Gordon. The second one is really not even testimonial because it was a statement that was gathered in November. The interview didn't happen until December. So we're really boiled down to just two statements. One is Joy's testimony relating to Joy, another victim, and the only one relating to Ruth on whether or not the defendant was married or not married to Ruth. And we submit that Joy testified here and was cross-examined. And because under AEDPA the determination of factual issues made by a state court shall be presumed to be correct, the state court here found that Joy testified that during the same time of the charged sexual assault, quote, the defendant was giving Joy a back rub when he moved his hand toward her right breast. And in another occasion, quote, defendant asked her if she wanted to have sex with him. That's on the clerk's docket 9 in our answer, Exhibit D at page 5. So there was overwhelming evidence that there was additional evidence that Joy testified, even assuming that the statements were error and were improperly admitted. Those statements did not substantially influence the verdict. And with respect to Ruth, the only statement that came out was that he was not married to Ruth. Now, granted that that's an element of the offense, there are other evidence that came out. It was clear to the jury, we suggest, that they were not married. The defendant was a 42-year-old male. Ruth was an 11-year-old. They lived separately in the same apartment complex. Ruth still lived with her mother. Ruth's mother testified. Ruth's father testified. Ruth's brother testified. And the defense never had a theory that he's not guilty of rape because they were married. And I just suggest to the court that in California, there is a parallel statute that makes it a crime to forcibly rape your spouse as well. Presumably, the parents would have known because I assume an 11-year-old girl can't get married without her parents' consent. Yes, and it was never really the defense's theory here that they were married. Now, if the court doesn't have any further questions, that would conclude our presentation. Thank you. Thank you. Do you have a rebuttal? This was actually an extremely close case. In a letter that's part of the record, one of the jurors wrote the judge saying, Microphone. I'm sorry, saying, It's finally over. Because of how it ended, I can't let it go. We came so close to acquitting him that it frightens me. I think it was a close case for a variety of reasons. The alleged rape wasn't Three hours of deliberation, they convict, and this juror says they were close to acquitting? I think you have to take the juror's word for it in that regard. Why must you? We normally don't allow testimony or evidence to impeach a verdict. The juror felt This just strikes me, this note just strikes me as sheer fantasy. The juror felt To go from almost acquitting to a conviction in three hours? The juror felt so strongly about the fact that they almost acquitted him that As sheer, he felt the need to write the judge. That doesn't mean being a prank or lying or doing anything. Why do we have to believe her? If you consider the other evidence, it becomes pretty obvious, I think, why they almost acquitted Mr. Sudeth. The victim didn't report the rape until 18 months after it occurred. She only reported the rape after she was being questioned by police officers. Her sister, the only other alleged eyewitness, testified that the rapes never happened. In opening and closing statements, the prosecutor himself told the jurors that the testimony depended entirely on the credibility of the alleged victim. Her testimony was replete with inconsistencies. I mean, putting aside the statement that was itself a threat, what did they get out of him anyway that was so damaging? I just didn't quite get it. Putting aside the threatening statement? Yeah, putting that aside. In regard to Joy Durham, an 11- He didn't say, oh, yes, I raped the girl, right? He didn't say anything like that. No, but he testified in regard to Joy, he allegedly told Officer Williams, or he did tell Officer Williams, that he would be flattered if an 11-year-old girl came on to him. Considering the context of the charges- What's the big deal about that? That's- I'm sorry? I was just going to say, I think it's not a normal response to suggest that you'd feel flattered if an 11-year-old girl came on to you. I mean, I raped her. It may be a little bit of a silly reaction. It may be, I don't know. I mean, how does that connect to the rape? It substantiated Ruth's claims that Mr. Zudek was interested in young girls. It essentially added fuel to the fire. It's very weak. If it substantiated it at all, what other statement was there? I think you have to look at- It's important to look at the prejudice, in this case, cumulatively. We raised four specific types of prejudice that occurred as a result of the admission of his statements. But it's the prejudice as a whole that was really damaging to Mr. Zudek. In a close case like this, where there's so much evidence suggesting that the crimes never occurred- Your normal Miranda cases, where the guy says, Okay, you know what, you got me good. I did it, and I'm glad. You know, that's your typical Miranda case. This doesn't come anywhere close to it. He just said, Well, I wouldn't have been flattered. It could be a flip comment. It could be a subjocular comment. It could be a silly comment. It could even show that, yes, maybe he's interested in attention from young girls, but that's a long ways from forcible rape. I think- There may be lots of people who are flattered by all sorts of things, but don't think about going out and committing violence. I mean, those are very different animals. That's why I think the threatening statements were so problematic, because out of all the evidence, the threats against the officer suggested that Mr. Zudek was the type of person who would commit a violent crime of this sort, the type of person who could rape an 11-year-old girl. It was the only testimony that suggested that. The testimony about his involvement with other young girls didn't suggest that he could commit a crime of this magnitude. This was an incredibly-the charges against him were that he forcibly raped a young girl two times. Nothing else in the evidence suggested that he was capable of that aside from the threats. Okay. Thank you very much. Thank you. KJ, you will stand for a minute. Thank you. We'll next hear argument in the case of Moore v. Rowland.
judges: Wallace, Kozinski, Thomas